UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOANNE J. PRIBNOW,

                Plaintiff,

                                            Case No. 21-cv-1238-pp

     v.

KILOLO KIJAKAZI,

                Defendant.

---

**ORDER AFFIRMING FINAL ADMINISTRATIVE DECISION OF COMMISSIONER**

---

On October 24, 2021, the plaintiff filed an appeal seeking review of an administrative law judge's final administrative decision that found him not "disabled" within the meaning of the Social Security Act. Dkt. No. 1. The Social Security Administration's Appeals Council denied review, rendering the administrative law judge's decision the final decision of the Commissioner. The court affirms the Commissioner's decision.

I.     **Procedural History and the ALJ's Decision**

On August 23, 2019, the plaintiff filed a Title II application for a period of disability and disability insurance benefits. Dkt. No. 10-1 at 18. On April 28, 2020, the plaintiff protectively filed a Title XVI application for supplemental security income. Id. at 18. In both applications, the plaintiff alleged a disability onset date of August 15, 2018. Id. The Social Security Administration (SSA)

1

initially denied the plaintiff's claims on March 6, 2020, id. at 63, 112, and denied them upon reconsideration on September 2, 2020, id. at 70–71, 117.

On November 5, 2020, the plaintiff filed a written request for a hearing before an administrative law judge (ALJ). Dkt. No. 10-1 at 18, 127, 140. On April 19, 2021, the plaintiff appeared at a telephone hearing represented by Attorney Joseph Manske.[1] Id. at 18. Both the plaintiff and vocational expert (VE) Darren Wright testified. Id. at 18, 42. ALJ Margaret O'Grady issued a decision on May 28, 2021, finding that the plaintiff was not "disabled" as defined by the Social Security Act. Id. at 33. The ALJ found that the plaintiff, born May 8, 1977, was 43 years old at the time of the hearing, id. at 25, 31, and "has at least a high school education," id. at 31. The ALJ acknowledged the plaintiff's hearing testimony that she was not currently working and had "last worked in 2016 for Amazon for about one month, but she stopped working there because she could not remember the work that was required." Id. at 25–26. The ALJ found that the plaintiff had "no past relevant work." Id. at 31 (citing 20 C.F.R. §§404.1565 and 416.965). The ALJ also found that the plaintiff's "earning records show[ed] that the" plaintiff "remain[ed] insured through December 31, 2007." Id. at 18.

---

[1] The ALJ's decision stated that the hearing was held via telephone "due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) Pandemic." Dkt. No. 10-1 at 18. The ALJ stated that "[a]ll participants attended the hearing by telephone" and that "[t]he claimant agreed to appear by telephone before the hearing, and confirmed such agreement at the start of the hearing." Id. See also id. at 43–44 (hearing transcript).

2

In evaluating a claim for disability benefits, the ALJ must follow a five-step, sequential process. Apke v. Saul, 817 F. App'x 252, 255 (7th Cir. 2020). Regarding the plaintiff's Title II claim, the ALJ found at step two that the plaintiff had no severe impairments:

> With regard to the claimant's Title II application, the claimant alleged an onset date of August 15, 2018 and her date last insured is December 31, 2007. The undersigned notes that there are very minimal records prior to 2007 (1F). The claimant did suffer a knee dislocation and underwent a right ankle fracture repair in 2006, but records show she recovered from those injuries (Id.). Based on the records in evidence for the time period prior to the date last insured, the undersigned finds that the claimant did not suffer from any severe impairments, received limited treatment, and the objective findings and physical examinations did not indicate that the claimant had any significant limitations.

Dkt. No. 10-1 at 21. The ALJ concluded that the plaintiff's "Title II application for benefits [was] denied based on no severe impairments." Id. On appeal to this court, the plaintiff does not argue that the ALJ erred in denying her Title II claim at step two. Beyond observing that "the ALJ found insufficient evidence existed prior to [the plaintiff's] date last insured to prove the existence of any severe impairments and consequently the ALJ denied the Title II claim outright, and consequently only considered her Title XVI claim in the decision," the plaintiff's brief does not mention her Title II claim. Dkt. No. 12 at 2–3.

After denying the Title II claim at step two, the ALJ noted that the remainder of the decision "pertain[ed] only to the claimant's Title XVI application with a protective filing date of April 28, 2020." Dkt. No. 10-1 at 21. The following chart summarizes the ALJ's findings at each step regarding the plaintiff's Title XVI claim:

3

| STEP | FINDINGS |
|------|----------|
| Step One: Is the claimant engaged in substantial gainful activity? | Claimant has not engaged in substantial gainful activity since August 15, 2018, the alleged onset date. |
| Step Two: Is the impairment or combination of impairments severe—does it significantly limit the claimant's mental or physical ability to do basic work activities? | The claimant has the following severe impairments: epilepsy, intracranial hypertension, fibromyalgia, obesity, ankylosing spondyloarthritis, degenerative disc disease, migraine headaches and depression. |
| Step Three: Does the impairment meet or equal any impairment listed in the regulations as being so severe as to preclude substantial gainful activity? | The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. |
| Step Four: Does the claimant's residual functional capacity allow the claimant to perform past relevant work? | Claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can never climb ladders, ropes, and scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; cannot work at heights or around hazards; is limited to frequent fine manipulation with the upper extremities; is limited to simple, routine, repetitive, noncomplex work involving 2 to 3 step instructions; limited to work with a fairly regular set of duties and expectations; and limited to |

| | occasional contact with co-workers and supervisors, but no public interaction. |
|---|---|
| <u>Step Five</u>: Can the claimant perform any other work existing in significant numbers in the national economy? | Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform: document preparer, ink printer, and hand mounter. |

<u>See</u> Dkt. No. 10-1 at 20, 21, 25, 32.[2]

The ALJ concluded that the plaintiff had "not been under a disability, as defined in the Social Security Act, from August 15, 2018, through the date of this decision." Dkt. No. 10-1 at 33. On August 19, 2021, the Appeals Council denied review. <u>Id.</u> at 6–8.

On October 24, 2021, the plaintiff appealed, seeking this court's review of the final administrative decision. Dkt. No. 1. The plaintiff is represented on appeal by Attorney Daniel Skaar. The plaintiff asks the court to reverse the ALJ's decision and direct the ALJ to find the plaintiff disabled and entitled to benefits retroactively from August 15, 2018. Dkt. No. 12 at 31. Alternatively, the plaintiff seeks remand "for an administrative hearing before an alternate ALJ . . . ." <u>Id.</u> On April 11, 2023, after the parties fully briefed the issues, dkt. nos. 12, 19, 20, the court held a hearing, at which the parties rested on their

---

[2] The claimant bears the burden of proof at steps one through four; at step five, the burden shifts to the Commissioner. <u>Ghiselli v. Colvin</u>, 837 F.3d 771, 776 (7th Cir. 2016) (citing <u>Butera v. Apfel</u>, 173 F.3d 1049, 1054 (7th Cir. 1999)).

5

briefs. <u>See</u> Dkt. No. 24 at 1:11–27 (hearing audio). The court advised the parties that it had reviewed the briefs and the arguments, then told them that it was affirming the ALJ's decision; the court informed the parties that it would be issuing a written decision, but briefly summarized what the parties could anticipate in that decision. <u>Id.</u> at 2:04–38.

## II.    Standard of Review

When the Appeals Council denies a plaintiff's request for review, the ALJ's decision constitutes the final decision of the Commissioner. <u>Gedatus v. Saul</u>, 994 F.3d 893, 898 (7th Cir. 2021). Section 405(g) of Title 42 limits the court's review; the district court must uphold the decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. §405(g); <u>Jelinek v. Astrue</u>, 662 F.3d 805, 811 (7th Cir. 2011). "An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." <u>Hopgood <i>ex rel.</i> L.G. v. Astrue</u>, 578 F.3d 696, 698 (7th Cir. 2009). (citation omitted). Courts have defined substantial evidence as "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." <u>Schaaf v. Astrue</u>, 602 F.3d 869, 874 (7th Cir. 2010). A decision denying benefits need not discuss every piece of evidence; remand is appropriate, however, when an ALJ fails to provide adequate support for the conclusions drawn. <u>Jelinek</u>, 662 F.3d at 811. If conflicting evidence in the record would allow reasonable minds to disagree about whether the plaintiff is disabled, the ALJ's decision to deny the

6

application for benefits must be affirmed if the decision is adequately supported. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008).

The district court must review the entire record, including both evidence that supports the ALJ's conclusions and evidence that detracts from the ALJ's conclusions, but it may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." Id. "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." Biestek v. Berryhill, ___ U.S. ___, 139 S. Ct. 1148, 1154 (2019). Judicial review is limited to the rationales offered by the ALJ. Shauger v. Astrue, 675 F.3d 690, 697 (7th Cir. 2012) (citing SEC v. Chenery Corp., 318 U.S. 80, 93–95 (1943)). The ALJ must follow the Social Security Administration's rulings and regulations in making a determination. Failure to do so requires reversal unless the error is harmless. See Prochaska v. Barnhart, 454 F.3d 731, 736–37 (7th Cir. 2006). A reviewing court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019) (quoting Lopez ex rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003)). The district court will uphold a decision so long as the record reasonably supports it and the ALJ explains her analysis of the evidence with enough detail and clarity to permit meaningful review. Eichstadt v. Astrue, 534 F.3d 663, 665–66 (7th Cir. 2008).

### III.  Analysis

The plaintiff's arguments on appeal can be grouped into five reasons the plaintiff believes the court must remand: (1) the ALJ did not properly consider Listing 14.09 and the discussion lacked substantial evidence; (2) the ALJ's analysis of the plaintiff's mental impairments and Residual Functional Capacity (RFC) assessment contained legal error; (3) the ALJ's RFC assessment did not adequately account for the plaintiff's alleged carpal tunnel syndrome; (4) the ALJ did not properly consider the plaintiff's impairments in combination; and (5) the ALJ failed to properly consider opinion evidence. Dkt. No. 12 at 5, 9, 19, 21, 28.

### A.  Listing 14.09 and Ankylosing Spondylitis

The plaintiff first argues that the ALJ's discussion of Listing 14.09 was insufficient and the ALJ's conclusion that the plaintiff's ankylosing spondylitis did not support a finding of disability at step three lacked substantial evidence. Dkt. No. 12 at 5–9. See id. at 9 ("In the end, the ALJ's failure to properly consider and evaluate the evidence that clearly supported a finding of disability under Listing 14.09C is plain legal error . . . ."). The ALJ's decision provided only one sentence regarding Listing 14.09's applicability: "In addition, there is no evidence of the criteria found in Listing 14.09." Dkt. No. 10-1 at 22. The plaintiff criticizes the ALJ's "analysis" of Listing 14.09 for failing to cite to the criteria, analyze the elements of the listing or discuss any evidence in the record showing that the plaintiff did not meet Listing 14.09. Dkt. No. 12 at 6. The plaintiff then provides information on ankylosing spondylitis from the

Mayo Clinic's website and the text of Listing 14.09C. Id. at 6–7. Finally, the plaintiff argues that the ALJ's analysis and conclusion that the plaintiff's ankylosing spondylitis did not meet or medically equal the severity of a listed impairment lacked substantial evidence. Id. at 7–9. The plaintiff asserts that the ALJ ignored evidence that supported a finding of disability at step three. Id. at 9.

The court notes that the ALJ's analysis of whether the plaintiff's ankylosing spondylitis met or medically equaled the severity of a listed impairment discussed Listing 1.15. Dkt. No. 10-1 at 22–23. The analysis the plaintiff critiques is included in a paragraph assessing the plaintiff's *fibromyalgia* condition. Dkt. No. 10-1 at 21–22. The ALJ observed there is no listing for fibromyalgia and therefore "considered the closest analogous sections, listings 1.18 and 14.09, to assess this condition . . . ." Id. at 21. The court nevertheless attempts to address the plaintiff's concerns.

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by *name* and offer more than a perfunctory analysis of the listing." Wilder v. Kijakazi, 22 F.4th 644, 652 (7th Cir. 2022) (emphasis in original) (quoting Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004)). When an ALJ fails to do so, "there is little basis for meaningful judicial review and remand therefore may be required." Zatz v. Astrue, 346 F. App'x 107, 110 (7th Cir. 2009) (citing Brindisi v. Barnhart, 315 F.3d 783, 785–86 (7th Cir. 2003)). But the Seventh Circuit recently made clear that its decision in "*Barnett* does not require ALJs to name and discuss every

9

Listing in their written decisions." Wilder, 22 F.4th at 652. The appellate court stated that "neither the SSA's regulations nor the Social Security Act impose an affirmative obligation on ALJs to scour the Listings for a possible match, no matter how unlikely." Id. at 653. The court explained that "[s]uch a requirement would be particularly unreasonable where . . . the claimant does not identify a Listing at the hearing . . . ." Id. at 652. After all, "a claimant bears the burden of proof at step three." Id. at 653.[3]

That said, the court is not sure why the ALJ chose to evaluate the plaintiff's ankylosing spondylitis under Listing 1.15 rather than, or in addition to, 14.09C.[4] Listing 1.15 involves disorders of the skeletal spine resulting in compromise of a nerve root. Listing 14.09 involves inflammatory arthritis, and subsection C explicitly involves ankylosing spondylitis. Analyzing an alleged impairment under the listing that specifically includes that impairment's name seems like the obvious choice.

---

[3] The claimant bears "the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing." Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006). "[T]he criteria for meeting a Listing are interpreted strictly." Wilder, 22 F.4th at 651 (citing Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify.")). See also 20 C.F.R. §404.1525(c)(3) (stating the SSA "will find that your impairment(s) meets the requirements of a listing when it satisfies *all of the criteria* of that listing") (emphasis added).

[4] Cases in this circuit assessing ankylosing spondylitis under Listing 14.09 include Hughes v. Colvin, 14-CV-1525-NJ, 2016 WL 8737430 (E.D. Wis. Mar. 9, 2016); Lakins v. Saul, 2020 WL 4808661 (N.D. Ind. July 27, 2020); Nicole v. Saul, 2020 WL 550603 (N.D. Ill. Feb. 4, 2020); Shepard v. Berryhill, 2019 WL 668495 (N.D. Ind. Feb. 19, 2019); Gfesser v. Astrue, 2010 WL 3385515 (N.D. Ill. Aug. 25, 2010); and Allen v. Barnhart, 408 F. Supp. 2d 598 (N.D. Ill. 2006).

But "an ALJ's failure to explicitly refer to a particular listing does not require automatic reversal, especially where . . . the ALJ's consideration of the listing is apparent from the record." Zatz, 346 F. App'x at 110 (citing Rice v. Barnhart, 384 F.3d 363, 369–70 (7th Cir. 2004)). In Wilder, for example, the Seventh Circuit found that because the ALJ "did discuss Listings 1.02 (major dysfunction of a joint) and 1.04 (disorders of the spine), both of which are musculoskeletal impairments . . . [t]he ALJ's failure to explicitly consider Listing 11.17, which falls under neurological disorders, was not reversible error." 22 F.4th at 652–53. See also Johnson v. Colvin, No. 14–cv–0029–bbc, 2014 WL 5474572 (W.D. Wis. Oct. 29, 2014) (finding that even though the ALJ did not identify a specific listing or say "ankylosing spondylitis," the ALJ used the term "chronic body system dysfunction," suggesting he properly considered the listings for autoimmune disorders (of which ankylosing spondylitis is one)).

It is true that for the most part, the ALJ's discussion at step three of whether the plaintiff's impairments met or medically equaled the severity of the listings merely stated the text of the listings and provided a generic "the evidence does not/the evidence fails to show." Dkt. No. 10-1 at 21–23. But again, such lack of detail provided specifically under the subheading for step three is harmless error. In the remainder of her decision, the ALJ clearly considered and "provided the discussion of [the plaintiff's] severe and non-severe impairments, the objective medical evidence, and her credibility directly after step 3 when [s]he determined her RFC." Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015). "The ALJ's chronicling of [the plaintiff's] many maladies

11

and extensive medical records shows that she was aware of [the] alleged impairments and the relevant evidence." Lott v. Colvin, 541 F. App'x 702, 706 (7th Cir. 2013). "This discussion provides the necessary detail to review the ALJ's step 3 determination in a meaningful way." Curvin, 778 F.3d at 650. See also Jeske v. Saul, 955 F.3d 583, 589 (7th Cir. 2020) ("But the discussion picked up in the next part of the ALJ's decision. There, the ALJ addressed specific evidence of Jeske's symptoms and explained why he found Jeske's statements about her symptoms were not fully substantiated by the other evidence, which showed her symptoms were less severe.").

The Seventh Circuit has emphasized that the court will "not discount [such information] simply because it appears elsewhere in the decision." Curvin, 778 F.3d at 650. "To require the ALJ to repeat such a discussion throughout h[er] decision would be redundant." Id. See Rice, 384 F.3d at 370 n. 5 (stating "it is proper to read the ALJ's decision as a whole" and that "it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five"); Orlando v. Heckler, 776 F.2d 209, 213 (7th Cir. 1985) ("[W]e examine the [ALJ]'s opinion as a whole to ascertain whether he considered all of the relevant evidence, made the required determinations, and gave supporting reasons for his decisions."). Social Security Rulings support this conclusion. See SSR 17-2p, 2017 WL 3928306, at *4 ("Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding [regarding medical equivalence]. An [ALJ's] articulation of the reason(s)

12

why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3.").

Other courts in similar cases have noted that although an ALJ's discussion under step three addressing whether a claimant's impairment met or medically equaled the severity of a listing may be less than ideal, it is not reversible error. See Jeske, 955 F.3d at 589; Curvin, 778 F.3d at 650; Johnson, 2014 WL 5474572. But see Lakins v. Saul, No. 3:19-CV-519-JD-JPK, 2020 WL 4808661, at *6 (N.D. Ind. July 27, 2020) (remanding because an ALJ's similar paragraph was insufficient for failing to discuss any evidence supporting the plaintiff's claim).

Finally, despite the plaintiff's contention, dkt. no. 12 at 9, n.6, the Commissioner's responsive arguments and the court's analysis are not in violation of Chenery's command that the court's judgment of the agency's decision must rest only on the grounds upon which the agency based its decision. See Chenery, 318 U.S. at 87–88. The Seventh Circuit has rejected a similar argument that when discussion of the evidence regarding whether a listing is met appears between steps three and four, rather than under the subheading for step three, the court analyzing it as if the ALJ applied it to its step three discussion violates Chenery. Jeske, 955 F.3d at 589–90. In Jeske, the court stressed that "[o]bserving that an ALJ placed some of its step-three rationale with its discussion of a claimant's RFC does not give the ALJ's step-

13

three determination new ground to stand upon. It simply identifies the ALJ's step-three rationale for review." Id. at 590.

"The ALJ's discussion at step 3, when considered in light of h[er] discussion of [the plaintiff's] RFC, sufficiently met h[er] 'duty to articulate.'" Curvin, 778 F.3d at 650 (quoting Scheck v. Barnhart, 357 F.3d 697, 700 (7th Cir. 2004)). The court is convinced that the ALJ would reach the same result on remand. Wilder, 22 F.4th at 654; Butler v. Kijakazi, 4 F.4th 498, 504 (7th Cir. 2021); Schomas v. Colvin, 732 F.3d 702, 707–08 (7th Cir. 2013). The court will not remand on this ground.

B.    Assessment of the Plaintiff's Mental Impairments

The plaintiff criticizes the ALJ's assessments of her alleged mental impairments, asserting that the ALJ erred in analyzing the paragraph B criteria and in crafting an RFC that did not adequately address the plaintiff's limitations in concentration, persistence and pace. Dkt. No. 12 at 9–19.

1.    Paragraph B Criteria

First, the plaintiff argues that the ALJ committed plain legal error in analyzing and discussing the paragraph B criteria because "the ALJ addressed work related functioning only once in the discussion of the four areas of functioning." Dkt. No. 12 at 10 (citing Dkt. No. 10-1 at 23–24). The plaintiff also asserts that the ALJ engaged in impermissible cherry picking by relying on "normal" mental status exams but ignoring other portions of the same records that demonstrate a disability. Id. at 11–13 (citing Gerstner v. Berryhill, 879 F.3d 257, 261–62 (7th Cir. 2018)). The ALJ found that the plaintiff has a

14

moderate limitation in all four domains that make up the paragraph B criteria. Dkt. No. 10-1 at 23–24. According to the plaintiff, however, the record evidence demonstrates that the ALJ should have found that the plaintiff has a marked or extreme limitation in understanding, remembering and applying information, dkt. no. 12 at 11, a marked limitation in interacting with others, id. at 13, and a marked limitation in concentrating, persisting or maintaining pace, id. at 14. Although the plaintiff criticizes the ALJ's analysis of the fourth domain as well (adapting or managing oneself), the plaintiff does not indicate the severity level she believes the ALJ should have found based on the evidence. See Dkt. No. 12 at 14–15.

The ALJ's decision provided detailed paragraphs for each domain of the paragraph B criteria, including discussion of the plaintiff's hearing testimony, her adult function reports and the medical evidence in the record. Dkt. No. 10-1 at 23–24. Later in the decision, in her step four analysis, the ALJ included another paragraph discussing the plaintiff's mental health impairments and summarizing the record evidence. Id. at 18. The ALJ did not ignore or cherry-pick portions of the record; she acknowledged evidence supporting the plaintiff's difficulties and impairments. Id. at 23–24, 28. As the Seventh Circuit repeatedly has asserted, "an ALJ's adequate discussion of the issues need not contain a complete written evaluation of every piece of evidence." Pepper v. Colvin, 712 F.3d 351, 362 (7th Cir. 2013). And the ALJ provided discussion of why she found that the record failed to fully substantiate the plaintiff's allegations of disabling mental health impairments. Dkt. No. 10-1 at 28–29.

This included consideration of treatment that the plaintiff had received and was currently receiving, as well as observations that most of the mental status exams were largely unremarkable. Id. The ALJ's decision also clearly stated that she found state agency consultant Dr. Deborah Pape's opinion persuasive and generally consistent with the overall record. Id. at 30. Dr. Pape opined that the plaintiff has only moderate limitations in understanding, remembering, or applying information; in interacting with others; in concentrating, persisting or maintaining pace; and in adapting or managing oneself. Dkt. No. 10-1 at 101, 108–09 (finding the plaintiff is "not significantly limited" or only "moderately limited"). The plaintiff points to no other medical sources opining on her limitations or abilities in these four areas of mental functioning, nor any evidence that the ALJ did not consider or that would suggest the marked/extreme limitations for which the plaintiff argues. The court concludes the ALJ adequately analyzed the plaintiff's functioning under all four domains of the paragraph B criteria and will not remand on this ground.

2. *Concentration, Persistence and Pace*

Second, the plaintiff argues that although the ALJ found that the plaintiff has a moderate limitation in concentration, persistence and pace, "it is unclear what RFC limitations were provided to account for this limitation." Dkt. No. 12 at 16. The plaintiff asserts that the RFC limiting her to "simple, routine, repetitive, non-complex work involving 2 to 3 step instruction," dkt. no. 10-1 at 29, is insufficient to address her moderate limitation in concentration, persistence and pace. Dkt. No. 12 at 16 (citing Varga v. Colvin, 794 F.3d 809,

16

813–14 (7th Cir. 2015); O'Connor-Spinner v. Astrue, 627 F.3d 614, 620 (7th Cir. 2010); Stewart v. Astrue, 561 F.3d 679, 685 (7th Cir. 2009)). The plaintiff argues that due to the combination of her "limited high school education, significantly impaired memory from her combined mental impairments in combination ('fibro fog' from her Fibromyalgia, seizure disorder, and depression) with the severe pain from her combined Fibromyalgia, ankylosing spondyloarthritis, and degenerative disc disease," the record evidence "demanded additional RFC restrictions to unskilled work involving routine tasks and instructions, the ability to maintain attention and concentration for two hour segments, and jobs requiring no fast paced work." Dkt. No. 12 at 18–19.

Seventh Circuit "caselaw emphasizes that 'both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record,' including even moderate limitations in concentration, persistence, or pace." Crump v. Saul, 932 F.3d 567, 570 (7th Cir. 2019) (quoting Varga, 794 F.3d at 813). In crafting an RFC, "the ALJ generally may not rely merely on catch-all terms like 'simple, repetitive tasks' because there is no basis to conclude that they account for problems of concentration, persistence or pace." Crump, 932 F.3d at 570 (quoting Winsted v. Berryhill, 923 F.3d 472, 477 (7th Cir. 2019); O'Connor-Spinner, 627 F.3d at 620). "The law does not require ALJs to use certain words, or to refrain from using others, to describe the pace at which a claimant is able to work." Martin v. Saul, 950 F.3d 369, 374 (7th Cir. 2020). But the

17

Seventh Circuit's precedent holds that "the ALJ must account for the 'totality of a claimant's limitations' in determining the proper RFC." Id. (citing Moreno v. Berryhill, 882 F.3d 722, 730 (7th Cir. 2018)).

The ALJ also is not required to use "specific terms" or "magic words" in posing questions and hypotheticals to the VE. Crump, 932 F.3d at 570. Substantively, "however, the ALJ must ensure that the VE is 'apprised fully of the claimant's limitations' so that the VE can exclude those jobs that the claimant would be unable to perform." Id. (quoting Moreno, 882 F.3d at 730; DeCamp v. Berryhill, 916 F.3d 671, 675–76 (7th Cir. 2019)). The Seventh Circuit has found "[t]he best way to do that is by including the specific limitations—like CPP—in the hypothetical." Id. (citing Moreno, 882 F.3d at 730). "When the ALJ supplies a deficient basis for the VE to evaluate the claimant's impairments, this error necessarily calls into doubt the VE's ensuing assessment of available jobs." Id. (citations omitted).

At step three, the ALJ found that "[w]ith regard to concentrating, persisting, or maintaining pace, the claimant had a moderate limitation." Dkt. No. 10-1 at 24. The ALJ provided the following summary of the evidence in the record supporting this finding:

> In her adult function reports, she indicated that her attention span depends on the day, and on a good day she can pay attention for about 30 minutes (1E, 10E). At the hearing, she indicated that she has experiences [sic] 1 to 2 seizures a week and described the seizure as her blacking out or losing track of what she is doing and that she cannot remember these episodes and no one can get her attention (Hearing Record). She also stated that she is not receiving any mental health treatment at this time (Id.). At the majority of medical appointments, the claimant's mental status was unremarkable; she presented as alert and oriented, with normal

mood and affect, normal behavior, normal speech, normal judgment and thought content, and normal attention/concentration (2F/5, 3F/26,36, 6F/41,43,47, 9F/15, 12F/31,43,78, 14F/9, 15F/9,13,18). However, given the claimant's reports of chronic physical pain she experiences, there is evidence that these impairments and associated symptoms would affect her ability to concentrate and maintain pace (Hearing Record). Given the overall evidence, the undersigned finds a moderate limitation in this area.

Id. In finding only a moderate limitation in concentration, persistence and pace, the ALJ's decision repeatedly stated that the "majority of mental status examinations were unremarkable" and cited the same string of Exhibits. Dkt. No. 10-1 at 24, 28–29, 30 (citing Exs. 2F at 5; 3F at 26, 36; 6F at 41, 43, 47; 9F at 15; 12F at 31, 43, 78; 14F at 9; 15F at 9, 13, 18). However, the plaintiff correctly points out, and the Commissioner concedes, that page 5 of Exhibit 2F, dkt. no. 10-1 at 361, and pages 26 and 36 of Exhibit 3F, id. at 415, 425, do not contain mental status examinations. The Commissioner argues that such an error is harmless because the ALJ otherwise cited substantial evidence supporting her conclusion that at the majority of appointments, the plaintiff's mental status was unremarkable. Dkt. No. 19 at 11, n.9. The ALJ's other citations do point to appointments during which medical providers noted unremarkable findings. See Dkt. No. 10-1 at 494, 496, 500, 620, 732, 744, 779, 897, 920, 924, 929.[5]

The ALJ's RFC purportedly accommodated the plaintiff's "moderate deficit" in concentrating, persisting or maintaining pace by limiting her to

_____

[5] The court notes that two of the three pages the ALJ cited from Exhibit 12 contain records from a June 1, 2017 appointment and a July 11, 2018 appointment, which predate the plaintiff's alleged disability onset date of August 15, 2018. See Dkt. No. 10-1 at 732, 744.

19

"simple, routine, repetitive, non-complex work involving 2 to 3 step instructions." Dkt. No. 10-1 at 25, 29. In the hypothetical to the VE, the ALJ included this limitation to "jobs considered simple/routine/repetitive/non-complex" and "two to three-step instructions." Id. at 59. In adopting these limitations, the ALJ relied on the opinions of Dr. Pape. See Dkt. No. 10-1 at 30. Dr. Pape summarized the record evidence and concluded that based on the evidence, the plaintiff "has no more than moderate limitations" in concentration, persistence and pace and "is able to sustain the basic mental demands of unskilled work." Id. at 101. Finding that the plaintiff has "sustained concentration and persistence limitations," Dr. Pape opined that the plaintiff is moderately limited in her abilities to "carry out detailed instructions," "maintain attention and concentration for extended periods," and "perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances." Id. at 108. Dr. Pape also found that the plaintiff is moderately limited in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." Id. Based on these findings, Dr. Pape explained that the plaintiff "would generally be able to focus to complete tasks of only 2–3 steps and would have increasing difficulty w/ more complex tasks." Id. The ALJ found Dr. Pape's "opinion persuasive as it is generally consistent with the overall record." Dkt. No. 10-1 at 30. The ALJ concluded that based on records and the

plaintiff's hearing testimony, the RFC "appropriately accommodated" the plaintiff's mental health impairment and associated symptoms. Id.

It is true that the Seventh Circuit often has "frowned at the notion that restriction to simple tasks adequately accommodates moderate CPP limitations." Bruno v. Saul, 817 F. App'x 238, 242 (7th Cir. 2020) (citing Crump, 932 F.3d at 570). But the court also has noted that Crump teaches only that restriction to simple, repetitive tasks is "generally" not sufficient and cautions that such generic restrictions *might* not adequately capture a claimant's limitations. Id. There is no bright line rule that using the phrase "simple, repetitive tasks" in an RFC is immediate cause for remand. Rather, the real concern is when "the restriction is used as a one-size-fits-all solution without delving into an individualized assessment of the claimant's specific symptoms." Id. (citing Martin, 950 F.3d at 373–74). Properly accommodating a claimant's limitations in concentration, persistence and pace is a fact-specific analysis.

In Bruno, the Seventh Circuit found there was no reversible error because the record contained a specific finding that the claimant struggled to concentrate only when the assignment was complex, and a restriction to simple tasks was thus appropriate. Bruno, 817 F. App'x at 242. In Jozefyk, the court noted the ALJ's RFC was sufficient because it "adequately account[ed] for the claimant's demonstrated psychological symptoms." Jozefyk v. Berryhill, 923

F.3d 492, 497–98 (7th Cir. 2019).[6] And in Urbanek, the court acknowledged that "[e]ven generic limitations, such as limiting a claimant to simple, repetitive tasks, may properly account for moderate limitations in concentration, persistence, and pace, so long as they 'adequately account for the claimant's demonstrated psychological symptoms' found in the record." Urbanek v. Saul, 796 F. App'x 910, 914 (7th Cir. 2019) (quoting Jozefyk, 923 F.3d at 498). See also Pavlicek v. Saul, 994 F.3d 777, 784 (7th Cir. 2021); Pytlewski v. Saul, 791 F. App'x 611, 616 (7th Cir. 2019); Dudley v. Berryhill, 773 F. App'x 838, 842 (7th Cir. 2019); Saunders v. Saul, 777 F. App'x 821, 825 (7th Cir. 2019). "[T]here is only so much specificity possible in crafting an RFC." Martin, 950 F.3d at 374. And in posing hypotheticals to the VE, the Seventh Circuit "will let stand 'an ALJ's hypothetical omitting the terms "concentration, persistence, and pace" when it [is] manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform.'" Kuykendoll v. Saul, 801 F. App'x 433, 438 (7th Cir. 2020) (alteration in original) (quoting O'Connor-Spinner, 627 F.3d at 620).

Here, the ALJ relied on Dr. Pape's narrative RFC in crafting restrictions for the plaintiff's limitations in concentration, persistence and pace. Dr. Pape opined that the plaintiff would have increasing difficulty with more complex tasks, dkt. no. 10-1 at 108, so the ALJ limited her to "simple" and "non-complex" work, id. at 25. Dr. Pape opined that the plaintiff would generally

---

[6] See also Johansen v. Barnhart, 314 F.3d 283, 288–89 (7th Cir. 2002); O'Connor-Spinner, 627 F.3d at 619 (summarizing similar cases).

have sufficient focus to complete tasks of only two to three steps, id. at 108, so the ALJ limited her to "work involving 2 to 3 step instructions," id. at 25. The ALJ similarly adopted Dr. Pape's recommended restrictions as to the plaintiff's moderate limitations in interacting with others and adapting or managing herself. Id. at 25, 29; 108–09. Dr. Pape did not recommend any other limitations, nor does the record contain evidence of any other medical source opining that additional limitations are necessary.

Yet the plaintiff argues that the evidence in the record "demanded additional RFC restrictions to unskilled work involving routine tasks and instructions, the ability to maintain attention and concentration for two hour segments, and jobs requiring no fast paced work." Dkt. No. 12 at 18. The Commissioner asserts that the RFC *does* account for each of these limitations except the "no fast-paced work" restriction. Dkt. No. 19 at 20. And according to the Commissioner, the plaintiff does not point to any medical records or opinion evidence supporting a specific pace limitation. Id. As to the plaintiff's first suggested additional restriction, without specifically using the term "unskilled work," the ALJ limited the plaintiff to "simple" and "non-complex" work both in the RFC, dkt. no. 10-1 at 29, and in the hypothetical to the VE, id. at 59. As to the plaintiff's added restriction that the plaintiff be limited to "work involving routine tasks and instructions," the ALJ did limit the plaintiff to "routine" and "repetitive" work, as well as "work with a fairly regular set of duties and expectations." Id. at 29 (ALJ's decision), 59 (hypothetical to the VE).

Case 2:21-cv-01238-PP   Filed 04/24/23   Page 23 of 58   Document 26

The plaintiff's assertion that the ALJ should have found that the plaintiff has only the "ability to maintain attention and concentration for two hour segments" similarly is without merit. Dr. Pape did not impose any such specific limitation, nor does the plaintiff point to any other medical evidence or medical source opining that such a restriction is necessary. The Commissioner argues that although the ALJ did not "explicitly" state that the plaintiff "need only maintain attention and concentration for two-hours at one time . . . this is implicit in the RFC assessment." Dkt. No. 19 at 20 n.17 (citing POMS DI 25020.010(B)(2)(a) (mental abilities needed for any job include "[t]he ability to maintain concentration and attention for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure).")). "The POMS manual has no legal force." Parker for Lamon v. Sullivan, 891 F.2d 185, 190 (7th Cir. 1989); Darley v. Berryhill, No. 17 C 50199, 2018 WL 5631519, at *3 (N.D. Ill. Oct. 31, 2018). But it makes sense that such a breakdown of time occurs in a regular 8-hour workday and VEs have this understanding when opining on jobs a claimant has the ability to perform. At the hearing, the VE explained that allowable breaks are a 15-minute break "roughly around the 2-hour mark," a meal break two hours after that ("generally halfway through the shift") and then another break "roughly 2 hours after the meal break." Dkt. No. 10-1 at 60. In other words, allowable breaks divide an 8-hour workday into 2-hour chunks of time, accommodating a limitation in the "ability to maintain attention and concentration for two hour segments" without explicitly adding such a restriction. The plaintiff has

provided no authority demonstrating that an ALJ must specifically include language stating a claimant's limitations apply in "two-hour segments."

Finally, the plaintiff's assertion that the ALJ also should have found that the plaintiff is limited to "jobs requiring no fast paced work" is not supported by medical evidence in the record. See Urbanek, 796 F. App'x at 914 (citing Yurt v. Colvin, 758 F.3d 850, 857 (7th Cir. 2014)). The plaintiff has not pointed to any medical source recommending or imposing such a restriction, and the plaintiff has provided no reason to doubt that the combination of limiting the plaintiff to "simple/routine/repetitive/non-complex, two to three-step instructions" does not sufficiently discount jobs requiring "fast-paced" work. Dkt. No. 10-1 at 59. The court will not remand on this ground.[7]

C.     The Plaintiff's Carpal Tunnel Syndrome and Bilateral Hand Functioning

The plaintiff's brief includes a section on the RFC's limitation to frequent bilateral hand functioning. Dkt. No. 12 at 19–21. It appears the plaintiff criticizes the ALJ's finding that the plaintiff is limited to *frequent* fingering rather than *occasional* fingering. Id. at 20. The plaintiff argues that this finding lacks substantial evidence because "the decision avoids all discussion of any evidence that indicated that she had difficulty using hands." Id. The plaintiff asserts the ALJ failed to consider evidence in the record strongly supporting a finding that the plaintiff should be limited to *less than* frequent bilateral

---

[7] The Seventh Circuit also has repeatedly found harmless error where the plaintiff does not identify any additional limitations the ALJ should have included. See Jozefyk, 923 F.3d at 498; Kuykendoll, 801 F. App'x at 438; Dudley v. Berryhill, 773 F. App'x 838, 842 (7th Cir. 2019).

25

fingering, id. at 20–21, and that the VE indicated there would be no positions at the sedentary level that the plaintiff could perform if she were limited to only *occasional* fine finger manipulation, id. at 19 (citing id. at 61).

The RFC limited the plaintiff to "frequent fine manipulation with the upper extremities." Dkt. No. 10-1 at 25. The ALJ's decision mentioned the plaintiff's hearing testimony that "she cannot lift because her shoulder gives out and her hands/wrists freeze up." Id. at 26. The ALJ included the plaintiff's alleged carpal tunnel syndrome as one of the physical impairments that the ALJ deemed non-severe. Id. at 21. As to medical findings, the ALJ stated that the record demonstrates the plaintiff was diagnosed with fibromyalgia and has complained of generalized arthralgias that are more pronounced in areas including her right shoulder and hands. Id. at 26 (citing Ex. 15F). The ALJ noted a May 2020 tissue examination that showed positive mild diffuse tenderness in the plaintiff's neck, shoulders, upper arms and forearms, as well as 16/18 positive tender points for fibromyalgia. Id. at 27 (citing Ex. 15F, Dkt. No. 10-1 at 921).

The ALJ stated that although the plaintiff's "carpal tunnel syndrome has been assessed as non-severe, the combination of that impairment with her fibromyalgia, which causes pain in her arm and freezing up of her hands/wrists," requires a limitation to "frequent fine manipulation with the upper extremities." Dkt. No. 10-1 at 29. This limitation to "frequent" rather than "occasional" fingering reflects the ALJ's reliance on state agency consultant Dr. William Fowler's opinion. Dr. Fowler opined that based on the

26

evidence, the plaintiff is "able to sustain sedentary exertional work" and that due to "the bilateral carpal tunnel in her hands, [she] is limited [to] frequent fine manipulation." Dkt. No. 10-1 at 107. See also id. at 100, 105 (same). The ALJ found Dr. Fowler's opinion persuasive because "it is generally consistent with the overall evidence" and adopted Dr. Fowler's recommended manipulative limitation. Id. at 29. The plaintiff has not pointed to any evidence of medical providers or examiners opining that the plaintiff requires a limitation of only "occasional" use of her hands.

The plaintiff points to portions of the record she argues the ALJ omitted but that demonstrate the plaintiff had difficulty using her hands and support a finding that she required a less than frequent fingering limitation. Dkt. No. 12 at 20–21. Most of these records contain the plaintiff's self-reported symptoms and the ALJ did cite to them, albeit generally and without any specific page citations. The ALJ concluded that the record failed to fully substantiate the plaintiff's allegations of disabling symptoms because treatment for her conditions "has been fairly conservative consisting of prescription medication, physical therapy, and chiropractic care (3F, 6F, 8F, 9F, 10F, 12F, 13F, 14F, 15F)." Dkt. No. 10-1 at 28, 29–30. The ALJ acknowledged that the plaintiff "testified that her physical impairments cause significant functional limitations," but found that "the records do not support that she is as limited as she suggests." Id. at 30. The ALJ also stated that during several appointments, the plaintiff "has reported some improvement with physical therapy and with medication," as well as "that she was able to be more active."

27

Id. (citing Exs. 6F at 13, 32, 34, 48; 13F at 4, 8, 27; 8F at 14; 10F at 10, 12; 15F at 19). In considering whether the record supported the alleged severity of the plaintiff's symptoms, "the ALJ will look to the . . . treatment received." Apke, 817 F. App'x at 257. See also SSR 16-3p, 2017 WL 5180304, at *9. The ALJ crafted an RFC accommodating the plaintiff's impairments but found that her "limitations are not work preclusive." Dkt. No. 10-1 at 30.

The plaintiff also asserts that the evidence "strongly supports a finding" that the plaintiff would be unable to use her hands "frequently" because "the term frequent is defined as use for up to 6 hours of an 8 hour workday, which is hardly a restriction at all." Dkt. No. 12 at 19, 21 (citing SSR 83-10 at Glossary). The plaintiff's understanding of the definition of "frequent" is incorrect. The glossary at the end of SSR 83-10 provides a more complete definition of "frequent":

> "Frequent" means *occurring from one-third to two-thirds of the time*. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires *standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday*. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

SSR 83-10, 1983 WL 31251, at *6 (emphases added). The plaintiff's assertion that the regulations define "frequent" as "up to 6 hours in an 8 hour work day" is a misleading oversimplification. The regulation included this language in relation to "being on one's feet up to two-thirds of a workday" and thus

28

requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, at *6. Generally, the regulation states that "'frequent' means occurring from one-third to two-thirds of the time." Id. This provides a range of anywhere from 2.7 hours to 5.3 hours of an 8-hour workday.

The ALJ's determination must be supported by substantial evidence, which the Seventh Circuit has observed "is not a high threshold" because substantial evidence "means nothing more than 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Karr v. Saul, 989 F.3d 508, 511 (7th Cir. 2021) (quoting Biestek, 139 S. Ct. at 1154). "In rendering a decision, an ALJ is not required to provide a complete and written evaluation of every piece of testimony and evidence, but must build a logical bridge from the evidence to his conclusion." Minnick v. Colvin, 775 F.3d 929, 935 (7th Cir. 2015) (citation omitted). The court cannot substitute its judgment for that of the ALJ's by reweighing the evidence. Karr, 989 F.3d at 513 (citation omitted). The plaintiff is correct that her hearing testimony and statements to examining providers demonstrate the symptoms and difficulty she has experienced with her hands. But ultimately, "an ALJ need only include limitations that are supported by the medical record." Reynolds v. Kijakazi, 25 F.4th 470, 473 (7th Cir. 2022). Even if the plaintiff's testimony had permitted the ALJ to impose greater manipulative limitations, "there is nothing that compels them." Delong v. Saul, 844 F. App'x 894, 900 (7th Cir. 2021). Despite the plaintiff's suggestion, the ALJ considered the plaintiff's carpal tunnel

29

syndrome and her paresthesia when crafting the RFC, and Dr. Fowler's opinion supports the ALJ's finding that the plaintiff can perform sedentary work with a limitation of frequent fine manipulation. The court will not remand on this ground.

D. Consideration of the Plaintiff's Impairments in Combination

The plaintiff argues that the ALJ's decision must be remanded because the ALJ failed to properly consider the plaintiff's alleged impairments in combination. Dkt. No. 12 at 21. Throughout this section, the plaintiff references her alleged Osgood Schlatter's disease, fibromyalgia, obesity, ankylosing spondylitis, Schmorl node and knee issues. Id. at 22–26. The plaintiff ultimately appears to take issue with the ALJ's RFC accounting for her "severe physical impairments and associated symptoms by reducing her to sedentary exertional work." Id. at 24 (quoting Dkt. No. 10-1 at 29). As best the court can tell, the plaintiff argues the ALJ's finding that the plaintiff was capable of the extended sitting required for sedentary occupations lacked substantial evidence because the ALJ failed to properly consider all these alleged impairments in combination. See id. at 26–28; id. at 24 (stating that "the ALJ does not explain how any of [the plaintiff's] impairments would be accommodated by sitting down for the majority of the workday").

The regulations require an ALJ to "consider the *aggregate* effect of [a claimant's] entire constellation of ailments–including those impairments that in isolation are not severe." Golembiewski v. Barnhart, 322 F.3d 912, 918 (7th

Cir. 2003) (emphasis in original) (citing 20 C.F.R. §404.1523).[8] "Even if each problem assessed separately were less serious than the evidence indicates, the combination of them might well be totally disabling." Martinez v. Astrue, 630 F.3d 693, 698 (7th Cir. 2011) (collecting cases). "[A] competent evaluation of [a claimant's] application depends on the total effect of all his [or her] medical problems." Golembiewski, 322 F.3d at 918. See also Engstrand v. Colvin, 788 F.3d 655, 661 (7th Cir. 2017) (stating that "an ALJ must consider an applicant's medical problems in combination").

But in assessing whether an ALJ properly considered all impairments in combination, the Seventh Circuit "require[s] only that the ALJ acknowledge having considered the aggregate effect, as long as the ALJ discusses each symptom." Lott, 541 F. App'x at 706 (citing Getch v. Astrue, 539 F.3d 473, 483 (7th Cir. 2008); Skinner v. Astrue, 478 F.3d 836, 845 (7th Cir. 2007)). The Seventh Circuit has found that an ALJ's "chronicling" of a claimant's "many maladies and extensive medical records shows that" the ALJ "was aware of [the claimant's] alleged impairments and the relevant evidence." Id. The court found that the ALJ's decision containing "statements that she examined the 'combination of impairments' at step two, 'considered all symptoms' at step four, and concluded that [the claimant] was not disabled 'by her alleged

---

[8] "As we—and other circuits—have emphasized repeatedly in reviewing denials of disability benefits by the Social Security Administration's administrative law judges, the *combined* effects of the applicant's impairments must be considered, including impairments that considered one by one are not disabling. . . . This is required by the Social Security Administration's own regulation . . . ." Williams v. Colvin, 757 F.3d 610, 613 (7th Cir. 2014) (emphasis in original).

impairments' [was] sufficient to show that the ALJ accounted for the aggregate effect of [the claimant's] symptoms." Id.

The ALJ provided a paragraph explaining why she included each physical limitation in the RFC:

> Additionally, *based on the combination of symptoms* from the claimant's fibromyalgia, back impairments, and obesity, which causes chronic pain and decreased mobility, she is restricted from climbing ladders, ropes, and scaffolds; can occasionally climb ramps and stairs; and can occasionally balance, stoop, kneel, crouch, and crawl. Based on the claimant's epilepsy, intracranial hypertension, and migraine headaches, she should also avoid all exposure to unprotected heights or dangerous moving machinery. And while the claimant's carpal tunnel syndrome has been assessed as non-severe, *the combination of* that impairment with her fibromyalgia, which causes pain in her arm and freezing up of her hands/wrists, the undersigned also limits her to frequent fine manipulation with the upper extremities.

Dkt. No. 10-1 at 29 (emphases added). The court addresses each alleged impairment mentioned in this section of the plaintiff's brief.

### 1.    *Osgood Schlatter's Disease[9] and Knee Pain*

The plaintiff criticizes the ALJ's decision for mentioning the plaintiff's Osgood Schlatter's disease only once, specifically in finding that it was a non-severe impairment. Dkt. No. 12 at 22. The plaintiff asserts that the ALJ's decision never again mentioned any physical limitations involving the plaintiff's knees, either alone or in combination with other impairments, aside from noting that the plaintiff "did suffer a knee dislocation and underwent a right

---

[9] Osgood-Schlatter disease is a condition that causes pain and swelling below the knee joint. Osgood-Schlatter Disease, Johns Hopkins Med., available at https://www.hopkinsmedicine.org/health/conditions-and-diseases/osgoodschlatter-disease.

ankle fracture repair in 2006, but records show she recovered from those injuries." Id. (quoting Dkt. No. 10-1 at 21). The plaintiff contends that the record indicates that she "continued to suffer severe knee pain and dysfunction much later than 2006." Id. From these records, the plaintiff indicates that she experienced continuous knee pain, required a cane for knee support and had a limited ability to kneel, be active, complete household activities, stand and walk. Id. at 22–23. Later, the plaintiff's brief includes a section suggesting that the ALJ failed to consider the plaintiff's knee impairments, as well as other "impairments that severely impact her lower extremity use," in combination with her obesity. Id. at 25. The plaintiff relies on a case in which the Seventh Circuit found that an ALJ failed to consider the bearing of the claimant's extreme obesity and remarked that "[i]t is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index in excess of 40." Id. (quoting Martinez, 630 F.3d at 698–99). Because the plaintiff makes additional arguments regarding the ALJ's failure to properly consider obesity in combination with the plaintiff's other impairments, the court will consider that issue last.

The ALJ found that the plaintiff's Osgood Schlatter's disease, as well as other lower extremity impairments such as her alleged ankle fracture, restless leg syndrome and left hamstring injury, all were non-severe impairments. Dkt. No. 10-1 at 21. The ALJ then included the common language that she "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional

33

capacity." Id. In summarizing the plaintiff's reported symptoms and hearing testimony, the ALJ included the plaintiff's assertions that "her impairments cause difficulty with her ability to lift, squat, bend, kneel, sit, stand, walk, climb stairs . . . ." Id. at 25. The ALJ also mentioned the plaintiff's reported "pain in her whole back, neck, right ankle, and knees every day." Id. at 26. In discussing the plaintiff's fibromyalgia, the ALJ observed that records showed the plaintiff presented with generalized arthralgias in areas including her knees. Id. at 26 (citing id. at 912–35). The ALJ noted that there is no record of a provider prescribing a walker or other assistive device for the plaintiff to walk and that "several physical exams showed that her gait was normal or somewhat antalgic with no use of an assistive device." Id. at 28 (citing id. at 402, 461, 469, 479, 489, 494, 620, 622, 726, 837, 864, 868, 897).

Due to the plaintiff's "chronic pain and decreased mobility," the ALJ restricted her from climbing ladders, ropes and scaffolds. Dkt. No. 10-1 at 29. The ALJ also limited the plaintiff to only occasionally climbing ramps and stairs and only occasionally balancing, stopping, kneeling, crouching and crawling. Id. In doing so, the ALJ adopted the recommendations of Dr. Fowler, id. at 29, who opined that due to the plaintiff's impairments, she "is restricted to occasional climbing of ladders/ropes/scaffolds." Dkt. No. 10-1 at 107. Dr. Fowler found that the plaintiff had no other postural limitations and was "unlimited" in her ability to climb ramps and stairs, balance, stoop (bending at the waist), kneel, crouch (bending at the knees) and crawl. Id. at 104–05. Dr. Fowler also opined that due to the combination of the plaintiff's impairments,

"she is able to sustain standing/walking for 2 hours of an eight-hour day." Id. at 104. The plaintiff does not point to any medical opinions or prior administrative findings suggesting otherwise. The ALJ referred again to her findings that although the plaintiff testified to more significant functional limitations caused by her physical impairments, "the records do not support that she is as limited as she suggests" based on the plaintiff's treatment, improvements and activity levels. Dkt. No. 10-1 at 30. The plaintiff has not provided any reason to doubt that the ALJ considered the plaintiff's alleged knee-related impairments in combination with her other impairments in crafting the RFC.

        2.    *Schmorl Node*

The plaintiff next argues that the decision failed to mention her "Schmorl node at T11-T12." Dkt. No. 12 at 23. The plaintiff does not provide any citation to the record here, but earlier mentions of a chronic Schmorl node in the plaintiff's brief do. See id. at 11 (citing Dkt. No. 10-1 at 895–898). This record evidence consists of notes from a consultation to discuss the plaintiff's back pain and the findings include a note that in evaluating her T11-T12 vertebrae, the medical provider noted "a Schmorl node at the superior endplate of T12." Dkt. No. 10-1 at 898. The provider ultimately diagnosed the plaintiff with degenerative disc disease, which the ALJ classified as a severe impairment and discussed in detail. Dkt. No. 10-1 at 20, 22, 25, 27. The ALJ then specifically explained that based on the plaintiff's back impairments and symptoms such as chronic pain and decreased mobility, in combination with her other

35

impairments, the RFC restricted the plaintiff from "climbing ladders, ropes, and scaffolds" and limited her to only "occasionally climb ramps and stairs; and . . . occasionally balance, stoop, kneel, crouch, and crawl." Dkt. No. 10-1 at 29. The ALJ's decision also cites to the records that include mention of a Schmorl node in discussing the plaintiff's degenerative disc disease. See Dkt. No. 10-1 at 27, 29. The fact that the ALJ never explicitly said "Schmorl node" in the decision does not mean that the ALJ did not consider the plaintiff's back impairments. Based on reviewing the medical records, it is the court's understanding that a Schmorl node is a type or indicator of a back impairment, not an independent diagnosis.

At another point in the brief, the plaintiff argues that the ALJ's decision ignored evidence that MRIs found a Schmorl node at T11-T12, "resulting in a failure to discover the significance of this diagnosis." Dkt. No. 12 at 8 (citing Dkt. No. 10-1 at 558). The plaintiff's record cite, however, does not include this information. And the plaintiff points to no evidence from a medical provider opining that an assessment of her back impairments is incomplete or inaccurate without mention of a Schmorl node.

### 3. *Fibromyalgia*

The plaintiff suggests that the ALJ failed to properly consider her fibromyalgia. Dkt. No. 12 at 23. The plaintiff asserts that the ALJ ignored a "July appointment" at which the plaintiff reported "experiencing trigger point pain in her neck, shoulders, upper arms, forearms, thighs, calves, and shins"

36

and presented with "18 of 18 positive trigger points for" fibromyalgia.[10] Id. The plaintiff states that the notes from this appointment "noted that it was difficult to differentiate her severe FM pain from the severe pain caused by her ankylosing spondylitis . . . ." Id. (citing Dkt. No. 10-1 at 930). The plaintiff is correct that the record evidence includes this information, but the court is unclear what such an observation reveals. The plaintiff provides no further argument on this point. And finally, the plaintiff argues that the ALJ "did not mention that there is no cure for" fibromyalgia. Dkt. No. 12 at 23. Again, the court is not sure how this observation furthers the plaintiff's argument. The plaintiff did not elaborate.

The ALJ's discussion of the plaintiff's fibromyalgia cited the exhibit to which the plaintiff points and summarized some of the medical findings, which indicates that the ALJ was aware of these records. Dkt. No. 10-1 at 26–27. The ALJ also cited to this exhibit in discussing the plaintiff's complaints of chronic pain and the treatment she has received. Id. at 28. "[A]n ALJ is not required to provide a complete and written evaluation of every piece of testimony and evidence . . . ." Minnick, 775 F.3d at 935 (citation omitted). The information that the plaintiff highlighted does not demonstrate that the ALJ's assessment was not supported by substantial evidence.

---

[10] The plaintiff cites a July 2020 exam documenting that a soft tissue examination showed "positive moderate diffuse tenderness in the neck, shoulders, upper arms, forearms, thighs, calves and shins" and that the plaintiff had "18/18 positive tender points for fibromyalgia." See Dkt. No. 10-1 at 929. The record does not entirely match the plaintiff's statements, but the court assumes this is the medical record to which the plaintiff refers.

Further, the ALJ concluded that the plaintiff's fibromyalgia is a severe impairment, dkt. no. 10-1 at 20, and the ALJ stated that she imposed a number of additional limitations in the RFC "based on the *combination of symptoms* from the claimant's *fibromyalgia*, back impairments, and obesity, which causes chronic pain and decreased mobility . . . ." Id. at 29 (emphases added). The plaintiff has not demonstrated that the ALJ failed to consider her fibromyalgia in combination with her other impairments.

### 4. *Obesity*

At several points throughout this section of her brief, the plaintiff argues that the ALJ failed to sufficiently consider the plaintiff's obesity in combination with her other impairments. See Dkt. No. 12 at 24–26. The plaintiff asserts that the ALJ failed to consider the significance of her multiple impairments impacting her lower extremity use (Osgood Schlatter's disease, fibromyalgia, ankylosing spondylitis) in combination with her "very extreme obesity." Id. at 25–26 (citing Martinez, 630 F.3d at 698–99). The plaintiff also suggests that because she is obese, she is incapable of performing sedentary work. Id. at 26. The plaintiff relies entirely on the Seventh Circuit's statements criticizing an ALJ for failing to discuss how a claimant's obesity affected her ability to do sedentary work:

> Remember that she's almost morbidly obese. This might make it difficult for her to sit for long periods of time, as sedentary work normally requires. Presumably she could get up from her work table from time to time, but that might be painful given her obesity—the sheer weight she must lift—and her leg pain, which is aggravated by standing, since standing requires her legs to support her great weight. We don't want to play doctor ourselves; but the likely difficulties that morbidly obese persons (and the plaintiff is almost

38

morbidly obese) face even in doing sedentary work are sufficiently obvious to have required the administrative law judge to instruct the consulting physician to consider the potential effect of the plaintiff's obesity on her ability to do sedentary work.

Id. (quoting Martinez, 630 F.3d at 688–89).[11]

"An ALJ must consider any limiting effects of obesity on a claimant's overall condition . . . ." Hisle v. Astrue, 258 F. App'x 33, 37 (7th Cir. 2007) (citing Prochaska, 454 F.3d at 736–37; Clifford v. Apfel, 227 F.3d 863, 873 (7th Cir. 2000)). The regulations remind ALJs "that the combined effects of obesity with other impairments can be greater than the effects of each impairment considered separately." SSR 02-1p, 2002 WL 34686281, at *1. See also Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009) (stating that "under S.S.R. 02–1p the ALJ must specifically address the effect of obesity on a claimant's limitations because, for example, a person who is obese and arthritic may experience greater limitations than a person who is only arthritic").

The ALJ's decision acknowledged that medical records show the plaintiff is obese. Dkt. No. 10-1 at 27 (citing Exs. 2F, 3F, 6F, 9F, 11F, 12F, 14F, 15F). The ALJ concluded that the plaintiff's obesity is a severe impairment. Id. at 20–21. The ALJ stated that as of July 2020, the plaintiff's height and weight resulted in a body mass index of 48.71. Dkt. No. 10-1 at 27 (citing id. at 929). The ALJ recounted the following information from the clinical guidelines regarding obesity:

---

[11] The plaintiff cites the incorrect case. The quoted portions are from Browning v. Colvin, 766 F.3d 702, 707 (7th Cir. 2014), not the Martinez case.

> For adults, both men and women, the clinical guidelines classify a BMI in the range of 25-29.9 as overweight and a BMI of 30 or above as obesity. The clinical guidelines recognize three levels of obesity. A BMI in the range of 30-34.9 is Level I. A BMI in the range of 35-39.9 is Level II. A BMI greater than or equal to 40 is Level III, which is considered extreme obesity and represents the greatest risk for developing obesity-related impairments.

Dkt. No. 10-1 at 27. See SSR 02-1p, 2002 WL 3468621, at *2. At one point in her brief, the plaintiff argues that the record contains evidence of much higher BMIs, specifically over 55. Dkt. No. 12 at 23 (citing Dkt. No. 10-1 at 483–84, 492–95, 503). These records reflect that the plaintiff's BMI was 55.61 in July 2018, dkt. no. 10-1 at 503, 56.23 in September 2018, id. at 499, 56.23 in October 2018, id. at 494–96, 55.76 in November 2018, id. at 492, 54.5 and 54.82 in February 2019, id. at 486, 489, and 55.37 in March 2019, id. at 484. These are higher than the 48.71 BMI that the ALJ noted from July 2020. At the hearing in April 2021, the ALJ asked the plaintiff her height and weight, to which the plaintiff replied she was five foot seven and a half inches and weighed 345 pounds. Dkt. No. 10-1 at 46. By the court's calculation, the plaintiff's measurements at the time of the hearing[12] equated to a BMI of 53.2.[13] The plaintiff also indicated at the hearing that her weight tends to fluctuate and that she has lost ten to fifteen pounds at times, which accounts for changes in her BMI over time. Id. at 46–47.

---

[12] See Farrell v. Astrue, 692 F.3d 767, 768 (7th Cir. 2012) (referring to claimant's BMI calculated by her height and weight "at the time of the hearing").

[13] See Adult BMI Calculator, CDC, available at https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi _calculator/bmi_calculator.html.

But the exact body mass index used in evaluating the plaintiff's disability claim is irrelevant here. The clinical guidelines cited by the regulations state that there are three levels of obesity; a BMI over 40 is considered "extreme obesity" and "represents the greatest risk for developing obesity-related impairments." See Dkt. No. 12 at 23 (quoting Dkt. No. 10-1 at 27); SSR 02-1p, 2002 WL 3468621, at *2. The plaintiff does not point to any reason the ALJ should have treated a BMI over 55 differently than a BMI between 40 and 55, nor do the regulations provide for such a distinction. Any error is harmless.

Moving into the analysis of how the plaintiff's impairments affected her RFC, the ALJ noted that part of the plaintiff's prescribed treatment included encouragement to lose weight. Dkt. No. 10-1 at 28 (citing generally Exhibits 3F, 6F, 8F, 9F, 10F, 12F, 13F, 14F, 15F). The ALJ also mentioned that in February 2020, the plaintiff "reported that she was much more active after losing about 60 pounds." Id. (citing id. at 782). The records reflect that the plaintiff's BMI at this point was 44.88. Id. at 782–83. The ALJ ultimately reduced the plaintiff to sedentary work and crafted additional limitations based in part on her obesity:

> [B]ased on the *combination of symptoms* from the claimant's fibromyalgia, back impairments, *and obesity*, which causes chronic pain and decreased mobility, she is restricted from climbing ladders, ropes, and scaffolds; can occasionally climb ramps and stairs; and can occasionally balance, stoop, kneel, crouch, and crawl.

Dkt. No. 10-1 at 29 (emphasis added). These restrictions show that the ALJ incorporated several of the limitations described in SSR 02-1p into the plaintiff's RFC. See SSR 02-1p, 2002 WL 3468621, at *6 ("An individual may have limitations in any of the exertional functions such as sitting, standing,

walking, lifting, carrying, pushing, and pulling. [Obesity] may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching."); Shumaker v. Colvin, 632 F. App'x 861, 867 (7th Cir. 2015) (noting the ALJ's RFC incorporated SSR 02-1p's limitations); Mueller v. Colvin, 524 F. App'x 282, 286 (7th Cir. 2013) (acknowledging SSR 02-1p's guidance that "obesity may affect one's ability to, for example, stand, walk, and stoop").

The ALJ's assessment relied on Dr. Fowler's opinions; Dr. Fowler found that the plaintiff is capable of sedentary work. Dkt. No. 10-1 at 29. Dr. Fowler's summary of the records and "additional explanation" section included information that during the plaintiff's most recent follow up appointment in July of 2020, the physical exam "findings showed BMI of 48.71." Dkt. No. 10-1 at 106. It also included notes that the plaintiff's physical exam findings in October 2019 "showed BMI 48.36" and physical exam findings in February 2020 "showed BMI 46.14." Id. at 107. The "claimant information" section stated that the plaintiff's self-reported height was 67 inches, her self-reported weight was 326 pounds and her BMI was 51.1. Id. at 92. Dr. Fowler was fully apprised of the plaintiff's obesity and concluded that based on the evidence, the plaintiff "is able to sustain sedentary exertional work." Id. at 107. Dr. Fowler imposed only a postural limitation of occasional climbing of ladders/ropes/scaffolds, id. at 105, and the only exertional limitation he imposed stated that due to the combination of the plaintiff's impairments, "she is able to sustain standing/walking for 2 hours out of an eight-hour day." Id. at 104. By finding that the plaintiff could only occasionally climb ramps and

42

stairs and occasionally balance, stoop, kneel, crouch and crawl, the ALJ incorporated *more* limitations into the RFC assessment than Dr. Fowler recommended. Dr. Fowler opined that the plaintiff had no limitations in these activities. See id. at 104–05.

Further, "a failure to explicitly consider the effects of obesity may be harmless error." Prochaska, 454 F.3d at 736–37. The Seventh Circuit "has repeatedly excused the harmless error of an ALJ who fails to explicitly address a claimant's obesity but arrives at a final decision after reviewing the medical opinions of physicians familiar with the claimant's obesity." Hisle, 258 F. App'x at 37 (citing Prochaska, 454 F.3d at 736–37; Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004)). Even if an ALJ did not *explicitly* consider a claimant's obesity, an "implicit consideration of [the claimant's] obesity through . . . review and discussion of her doctors' reports" is harmless error "because the record relied upon by the ALJ sufficiently analyzes" the claimant's obesity. Prochaska, 454 F.3d at 737 (citing Skarbek, 390 F.3d at 504). In Prochaska, for example, the court found that any error on the ALJ's part was harmless because the ALJ cited and relied upon medical records noting the claimant's height and weight and opinions of physicians who discussed her weight: "Ms. Prochaska is an overweight female in no distress," "she was overweight but 'in no acute distress,'" and describing her as "chronically obese." Prochaska, 454 F.3d at 737.

In noting that the medical records showed that the plaintiff is obese, the ALJ cited Exhibits 2F, 3F, 6F, 9F, 11F, 12F, 14F and 15F. Dkt. No. 10-1 at 27.

43

Although the ALJ did not provide specific page citations, these records document medical appointments to discuss the plaintiff's multiple physical impairments and include notes of her BMI and morbid/severe obesity and various observations that she nevertheless was well developed, well-nourished and in no acute distress. See, *e.g.*, Dkt. No. 10-1 at 374, 377–78, 394, 397, 399, 405–07, 412, 413, 471–79, 481, 483–84, 486, 489, 492, 494, 499–500, 503, 507–08, 607, 610, 614, 616, 620, 624, 693, 696, 698, 710, 712, 713, 715, 716, 718, 720, 722, 732, 770, 778, 784, 787, 920–22, 924–26, 929. A few records refer to the possible effects of the plaintiff's obesity, including "risk factors for endometrial hyperplasia or cancer," id. at 379, "extreme obesity with alveolar hypoventilation," id. at 456–57, assessing her chronic back pain and noting "multiple medical co-morbidities including . . . severe obesity" that may impact therapy, id. at 470, "sleep-related hypoxemia/hypoventilation probably related to morbid obesity," id. at 520, suspecting her "lower extremity edema" is "multifactorial, likely related to obesity and possibly sodium intake," id. at 711, and discussing her possible sleep apnea and noting that "there is a possibility that she might be having some obesity hypoventilation syndrome and may need a different machine rather than just CPAP," id. at 496. None of these records or notes recommend limitations based on the plaintiff's obesity in combination with her other physical impairments. See, *e.g.*, Dkt. No. 10-1 at 404 (noting she is obese but indicating no particular effect on her hip pain); 897–98 (noting she is obese, but well developed and well-nourished and not indicating that it is a factor further impacting her degenerative disc disease and

44

back pain). As in the Hernandez case, in which the Seventh Circuit found any error was harmless, the medical records the ALJ cited "make repeated reference to [the plaintiff's] obesity" and "they contain no reference . . . to any specific limitations caused by obesity." Hernandez v. Astrue, 277 F. App'x 617, 624 (7th Cir. 2008).

Finally, a "claimant must articulate how her obesity limits her functioning and exacerbates her impairments." Hisle, 258 F. App'x at 37 (citing Prochaska, 454 F.3d at 736–37; Skarbek, 390 F.3d at 504). When a claimant fails to explain specifically how her obesity affects her ability to work and only suggests that it "generally exacerbates her impairments," any failure by the ALJ to *explicitly* consider obesity is harmless error. See Skarbek, 390 F.3d at 504 (finding that remand for explicit consideration of obesity would not affect the outcome of the case because "notably," the claimant did not "specify how his obesity further impaired his ability to work, but speculate[d] merely that his weight makes it more difficult to stand and walk"); Hernandez, 277 F. App'x at 624 ("Hernandez did not articulate how her obesity exacerbated her underlying conditions and further limited her functioning—as it was her burden to do.").

The ALJ considered the plaintiff's obesity, concluded that it was a severe impairment and analyzed the effect of that impairment on her RFC by referencing the regulations' guidance on obesity (SSR 02-1p). See Shumaker, 632 F. App'x at 867–68; Brumbaugh v. Saul, 850 F. App'x 973, 976 (7th Cir. 2021). The ALJ did not fail to consider the plaintiff's obesity in combination with her other impairments.

45

5. *Capacity to Perform Sedentary Work*

Finally, the plaintiff argues that the ALJ's finding that the plaintiff has the capacity to perform sedentary work lacked substantial evidence because the ALJ ignored evidence in the record demonstrating that the plaintiff cannot sit for more than twenty minutes at a time and is not capable of "the extended sitting required for sedentary work." Dkt. No. 12 at 26–28. The plaintiff points to several portions of the record that she argues the ALJ ignored but that support a finding that the plaintiff cannot perform the prolonged sitting required for sedentary occupations. Id. at 27 (citing Dkt. No. 10-1 at 55, 194, 197–99, 201, 228, 237, 254, 271, 275, 400–01, 460, 463, 559, 565, 572, 582, 588, 621–22, 895). All these citations refer to statements made by the plaintiff in her functional report, dkt. no. 10-1 at 194–275, by her son in a third-party report, id. at 237, or medical record notes of "subjective" information that she reported to providers. Yet the plaintiff argues that the ALJ's decision never attempted to refute the plaintiff's allegations as to her sitting limitations. Dkt. No. 12 at 26–27.

The ALJ did acknowledge the plaintiff's assertion that her impairments caused difficulty with her ability to sit. Dkt. No. 10-1 at 25 (citing id. at 187–201, 262–75 (function reports)).[14] The ALJ specifically mentioned that "[w]ith

_____

[14] In her October 2019 function report, the plaintiff indicated that she is limited in her ability to sit, that she can only sit for 15 minutes without a break and that she can sit for 4 hours in an 8-hour workday. Dkt. No. 10-1 at 194, 197. She explained that sitting puts pressure on her back and she has to "stop every so often to rest and try to move" her back, but "it doesn't help." Id. at 199. She stressed that she is only "able to sit about 10 to 15 minutes and then [she has] to move around," and that "[a]n additional 15 and [she has] to get up

46

regard to her back pain, [the plaintiff] estimated that she could sit for 15 to 20 minutes . . . ." Id. at 26. But a claimant's "subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record." Arnold v. Barnhart, 473 F.3d 816, 823 (7th Cir. 2007). The ALJ explained why she concluded that the record failed to fully substantiate the plaintiff's allegations of disabling symptoms. Id. at 28. For example, the ALJ noted that the plaintiff reported some improvement with physical therapy and medication during several appointments and that her activity did not support a finding that her limitations were work preclusive. Id. at 29–30. Although the ALJ did not explicitly explain why she did not accept the plaintiff's alleged limitations as to sitting specifically, the ALJ relied on Dr. Fowler's opinions in crafting the RFC limiting the plaintiff to sedentary work. Dkt. No. 10-1 at 29. Dr. Fowler opined that based on the evidence, the plaintiff "is able to sustain sedentary exertional work," and he did not impose any specific limitations on her ability to sit. Id. at 107. Dr. Fowler found that the plaintiff had the ability to sit (with normal breaks) for "about 6 hours in an 8-hour workday." Id. at 103–04. This aligns with the regulations' definitions explaining that in sedentary work, which is "work performed primarily in a seated position," "sitting should

---

and stand and stretch." Id. at 201. She indicated that if she "sat for too long [she] would often stiffen up and need to go take a hot shower to relax." Id. In her June 2020 functional report, the plaintiff indicated she could sit for a half hour before needing a break and that she could sit for 3 hours a day. Id. at 275. At the hearing, the plaintiff testified that she can only sit for "maybe 15 to 20 minutes" without any discomfort or pain. Dkt. No. 10-1 at 55. The plaintiff explained that at that point, her "lower back starts to hurt and it causes shooting pains down to the legs and to knees and then the feet fall asleep." Id.

generally total approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5.

The plaintiff argues in her reply brief that Dr. Fowler's opinion is not based on substantial evidence and that the ALJ therefore erred in relying on it. Dkt. No. 20 at 10. This argument lacks merit. Dr. Fowler's notes include a detailed summary of the record evidence. Dkt. No. 10-1 at 103, 106–07.

Dr. Fowler is the only medical source in the record opining on the plaintiff's ability to sit. And in all the medical records addressing the plaintiff's pain—records that included notes about her reported sitting limitations—there is no reference to any specific restrictions regarding her ability to sit for periods of time. Hernandez, 277 F. App'x at 624. No medical source "ever suggested that any greater limitation was required." Sienkiewicz v. Barnhart, 409 F.3d 798, 803 (7th Cir. 2005).[15] See also Gedatus, 994 F.3d at 904 ("A fundamental problem is she offered no opinion from any doctor to set sitting limits, or any other limits, greater than those the ALJ set."); Rice, 384 F.3d at 370 ("More importantly, there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ."). The plaintiff has not demonstrated that the ALJ's finding that the plaintiff could perform sedentary work, with additional limitations, was not supported by substantial evidence.

---

[15] The Sienkiewicz court rejected the claimant's argument that the ALJ did not consider her testimony that she could only sit for 40 minutes at a time and erred in instead finding that she could sit for six hours in an eight-hour workday with normal breaks. 409 F.3d at 803.

48

6. *Conclusion as to the Plaintiff's Assertion that the ALJ Failed to Consider Her Impairments in Combination*

Many of the plaintiff's assertions in this portion of her brief amount to an argument that the ALJ failed to consider certain evidence in the record and therefore did not properly consider the plaintiff's impairments in combination. But "an ALJ is not required to provide a complete and written evaluation of every piece of testimony and evidence . . . ." Minnick, 775 F.3d at 935 (citation omitted). And "[t]he court cannot substitute its judgment for that of the ALJ's by reweighing the evidence." Karr, 989 F.3d at 513 (citation omitted). Substantial evidence "means nothing more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Karr, 989 F.3d at 511, and for the reasons previously outlined, the ALJ's decision built a logical bridge from the evidence to the conclusion. Minnick, 775 F.3d at 935. The court will not remand on this ground.

E. Opinion Evidence

Finally, the plaintiff argues that the court must remand for the ALJ's failure to properly consider opinion evidence. Dkt. No. 12 at 28–30.

1. *Lace Ihde, APNP*

First, the plaintiff asserts that the ALJ erred in concluding that Lace Ihde's opinion was not persuasive. Dkt. No. 12 at 28–29. Ihde is an advanced practice nurse prescriber (APNP) who is one of the treating providers seeing the plaintiff for her idiopathic intracranial hypertension and epilepsy. See Dkt. No. 10-1 at 937. Ihde submitted a November 4, 2020 letter on behalf of the plaintiff. Id. The plaintiff asserts that the ALJ's response to Ihde's letter "can

49

only be seen as [the ALJ's] own medical opinion" and appears to argue that the ALJ ignored evidence in the record supporting Ihde's opinion as to the plaintiff's headaches, forgetfulness and depression. Dkt. No. 12 at 28–29.

The regulations include a "Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice" as an acceptable medical source "only with respect to claims filed . . . on or after March 27, 2017." 20 C.F.R. §404.1502(a)(7). The plaintiff filed her claim on April 28, 2020, and Ihde, an advanced practice registered nurse, is therefore an acceptable medical source. For claims filed on or after March 27, 2017, the rules in 20 C.F.R. §404.1520c apply for considering and articulating medical opinions. An ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Rather, ALJs must consider the medical source provider's opinion "using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." Id. The regulation also states that the most important factors to consider when evaluating the persuasiveness of a medical opinion are supportability and consistency. Id.

Ihde's letter indicated that the plaintiff initially sought treatment for head pain and cognitive changes in June 2018. Dkt. No. 10-1 at 937. Ihde stated that upon examination, she and her colleague, Dr. Xian Gu, diagnosed the plaintiff with idiopathic intracranial hypertension and epilepsy with complex/partial seizures. Id. Ihde asserted that the plaintiff's "condition is

50

severe" and that despite medication, the plaintiff "continues to have intermittent episodes of confusion and lapses in memory" and "her memory remains significantly impaired." Id. Ihde opined that the plaintiff "is unable to perform basic work-related activities due to chronic head pain and impaired memory," and stated it is her "professional opinion" that the plaintiff "is permanently disabled and unable to complete significant, gainful activity." Id.

The ALJ's decision acknowledged and provided a similar summary of Ihde's letter. Dkt. No. 10-1 at 30–31 (citing id. at 937). The ALJ then explained there were three reasons she did not find Ihde's opinion persuasive:

> While the undersigned has considered this opinion in the context of the treatment records, the opinion is not found persuasive. First, the opinion is not supported by the records as the claimant's hypertension condition has been stable and she does not have seizures to the extent alleged. Second, the undersigned notes that this opinion is conclusory and does not include a function by function analysis of the claimant's physical capabilities and lacks vocationally relevant limitations. And finally, the opinion is unpersuasive because the issue of whether an individual is disabled/unable to work is reserved to the Commissioner (20 CFR 404.1527(d) and 416.927(d)).

Dkt. No. 10-1 at 31 (citing id. at 937).

As mentioned, the regulations applicable to considering medical opinions in claims filed after March 2017 state that the most important factors are supportability and consistency, and ALJs are required to articulate how they considered these factors in evaluating a medical opinion. 20 C.F.R. §404.1520c(b)(2). "Supportability addresses the extent to which the medical opinion is explained by the provider and supported by objective findings . . . [w]hereas consistency addresses the extent to which a medical opinion is

51

consistent with the record evidence as a whole, including evidence from other medical and nonmedical sources."[16] <u>Wachholz v. Kijakazi</u>, No. 20-CV-1412, 2022 WL 787932, at *4 (E.D. Wis. Mar. 15, 2022) (citations omitted).

The ALJ's first reason for finding Ihde's opinion unpersuasive was that it was inconsistent with substantial evidence in the record, which appears to relate to the consistency factor. Dkt. No. 10-1 at 31 (stating that Ihde's "opinion is not supported by the records as the claimant's hypertension condition has been stable and she does not have seizures to the extent alleged"). "Section 404.1520c(c) requires ALJs to explicitly explain why particular medical opinions are consistent with the record as a whole." <u>Bakke v. Kijakazi</u>, 62 F.4th 1061, 1067 (7th Cir. 2023) (citing 20 C.F.R. §404.1520c(b)(2), (c)(1)[17]). The ALJ's one sentence barely scrapes past the "explicitly explain" requirement, but the ALJ did evaluate the record evidence and articulate elsewhere in the decision that the plaintiff's intracranial hypertension and seizure conditions have improved with treatment and that they are not as severe as the plaintiff alleges. The court does not discount information "simply because it appears elsewhere in the decision." <u>Curvin</u>, 778

---

[16] <u>See also</u> <u>Stevens v. Kijakazi</u>, No. 21-CV-270-SCD, 2022 WL 1000598, at *6 (E.D. Wis. Apr. 4, 2022) (explaining that "[t]he supportability factor focuses on what the source brought forth to support his or her findings" and "[t]he consistency factor . . . compares the source's findings to evidence from other sources").

[17] This cite to subsection (c)(1) may be a typo, as it is subsection (c)(2) that is the consistency prong and (c)(1), as the opinion notes a few lines down, that is supportability.

F.3d at 650. It is proper to read and examine the ALJ's decision as a whole. Rice, 384 F.3d at 370 n.5; Orlando, 776 F.2d at 213.

In assessing the plaintiff's impairments, the ALJ included records mentioning the plaintiff's memory issues and seizures. Dkt. No. 10-1 at 23–24. The ALJ's decision provided an overview of the plaintiff's testimony and subjective reports as to her seizures, migraines and memory changes. Id. at 25–26. And the decision summarized in detail the objective medical evidence regarding the plaintiff's epilepsy, memory changes, intracranial hypertension and migraine headaches. Id. at 26. The ALJ concluded that the record failed to fully substantiate the plaintiff's claims of disabling symptoms because the record showed her "seizures, intracranial hypertension, and migraine headaches have been fairly well controlled with medication." Id. at 28 (citing Dkt. No. 10-1 at 824–88 (Ex. 13F)). See also id. at 29–30.

The ALJ's second reason for finding Ihde's opinion unpersuasive was that Ihde's opinion was merely conclusory; this appears to relate to the supportability factor. "An ALJ may discount a doctor's statements that are not adequately explained if the treatment notes do not clarify the doctor's reasoning." Cooley v. Berryhill, 738 F. App'x 877, 880 (7th Cir. 2018) (citing Schaaf, 602 F.3d at 875; Rice, 384 F.3d at 371).[18] And the supportability factor reflects that "ALJs should give more weight to medical opinions with more

_____

[18] See also Suide v. Astrue, 371 F. App'x 684, 690 (7th Cir. 2010) ("Dr. Palacci's evaluation did not include a *functional* assessment of Suide's abilities, nor did she opine about any limitations Suide's impairments may have caused, so her report could not be used to support specific limitations included in Suide's residual functional capacity.") (emphasis in original).

internal explanation and support than to those without." <u>Bakke</u>, 62 F.4th at 1068 (citing 20 C.F.R. §404.1520c(c)(1)).

Even if the court concluded that the ALJ erred in failing to expressly consider each of the supportability and consistency factors, the court would not remand for further proceedings because any error was harmless. <u>See</u> <u>Ray v. Saul</u>, 861 F. App'x 102, 106 (7th Cir. 2021). All that would change on remand is the reiteration of information expressed elsewhere in the ALJ's decision, and because "the ALJ would reach the same result on remand, then the error is harmless and a remand is not required." <u>Karr</u>, 989 F.3d at 513.

Finally, the ALJ appropriately found unpersuasive Ihde's opinions that the plaintiff "is unable to perform basic work-related activities" and "is permanently disabled and unable to complete significant, gainful activity." Dkt. No. 10-1 at 937. The ALJ noted that "the issue of whether an individual is disabled/unable to work is reserved to the Commissioner." Dkt. No. 10-1 at 31 (citing 20 CFR §§404.1527(d) and 416.927(d)). In its list of "[e]vidence that is inherently neither valuable nor persuasive," the regulations include "[s]tatements on issues reserved to the Commissioner" such as statements that the claimant is or is "not disabled, blind, able to work, or able to perform regular or continuing work . . . ." 20 C.F.R. §404.1520b(c)(3)(i).[19] <u>See also</u> <u>Albert v. Kijakazi</u>, 34 F.4th 611, 616 (7th Cir. 2022) (agreeing a physician's letter was not persuasive because "the ultimate determination of disability is

---

[19] "Paragraphs (c)(1) through (c)(3) apply in claims filed . . . on or after March 27, 2017." 20 C.F.R. §404.1520b(c).

reserved for the Commissioner, and summarily asserting that the claimant is disabled does not suffice under the Commissioner's regulations"). The ALJ did not err in her consideration of Ihde's letter, and even if she had erred in her specific articulation of how she considered Ihde's letter, any error would have been harmless.

## 2. *Third Party Statements*

The plaintiff also asserts that the ALJ failed to properly consider letters from the plaintiff's son, friends and family members. Dkt. No. 12 at 29–30. The plaintiff argues that the ALJ erred in rejecting two reports from the plaintiff's son, who lived with her and "describe[ed] in great detail his first hand [sic] observations of his mother's daily functioning and witnessed seizures." Id. at 29. The plaintiff also criticizes the ALJ for assigning no weight to "several letters" provided by friends and family members regarding the plaintiff's impairments and symptoms. Id. at 29–30. In support, the plaintiff cites a 2014 case from Judge Griesbach and a 1999 case from the Northern District of Indiana. Id. at 30 (citing Smith v. Colvin, 9 F. Supp. 3d 875, 889 (E.D. Wis. 2014); Behymer v. Apfel, 45 F. Supp. 2d 654, 663–64 (N.D. Ind. 1999)). The plaintiff relies on Judge Griesbach's caution that "[t]he ALJ should not . . . simply presume that the lay witness is biased based on his or her relationship to the claimant and ignore the testimony on that basis." Smith, 9 F. Supp. 3d at 889. Judge Griesbach then quoted the Northern District of Indiana case, which in turn cited a 1984 Eighth Circuit case: "When an ALJ fails to believe lay testimony about a claimant's allegations of pain or other symptoms, he

55

should discuss the testimony specifically and make explicit credibility determinations." Behymer v. Apfel, 45 F. Supp. 2d 654, 663–64 (N.D. Ind. 1999) (citing Smith v. Heckler, 735 F.2d 312, 313 (8th Cir. 1984)).

The regulations provide that in assessing a claimant's RFC, ALJs will "consider descriptions and observations of [a claimant's] limitations from [his or her] impairment(s), including limitations that result from . . . symptoms, such as pain, provided by [the claimant], [the claimant's] family, neighbors, friends, or other persons." 20 C.F.R. §416.945(a)(3). See also §416.929(c)(3) (stating that in evaluating the intensity and persistence of symptoms and determining the extent to which symptoms limit the capacity for work, ALJs "carefully consider any other information" such as information that "nonmedical sources provide about [a claimant's] pain or other symptoms"). It is therefore true that an ALJ should not reject a letter from a third party solely because it is not a medical opinion. See Grevich v. Berryhill, No. 18-cv-418-bbc, 2019 WL 518552, at *6 (W.D. Wis. Feb. 11, 2019) (stating the plaintiff correctly noted an ALJ "cannot disregard a third-party statement merely because the author is not medically trained or is related to the claimant").

But the plaintiff ignores Judge Griesbach's point that "ALJs are not required to incorporate these [third party] statements into the RFC and may discount the testimony if they find that it conflicts with the medical evidence or otherwise lacks credibility." Smith, 9 F. Supp. 3d at 889 (citing Arnold, 473 F.3d at 821–22; Cirelli v. Astrue, 751 F. Supp. 2d 991, 1008–09 (N.D. Ill. 2010)). In Arnold v. Barnhart, the Seventh Circuit found that the opinions of

four neighbors, "none of whom were health care professionals, were not competent to refute the professional medical testimony." 473 F.3d 816, 822 (7th Cir. 2007) (citations omitted). District courts in this circuit routinely cite Arnold for the proposition that "a lay opinion is not competent to refute professional medical testimony or establish the existence of an impairment as a layperson is not an 'acceptable medical source.'" Davis v. Colvin, No. 13 CV 5204, 2016 WL 278859, at * 9 n.1 (N.D. Ill. Jan. 22, 2016); Grevich, 2019 WL 518552, at *6. See also 20 C.F.R. §404.1520c(d) (stating that ALJs "are not required to articulate how [they] considered evidence from nonmedical sources using the requirements" for medical opinions and prior administrative findings); 20 C.F.R. §404.1502(e)(4) (stating individuals such as family members, caregivers, friends and neighbors are nonmedical sources of evidence).

Here, as in Arnold, "the ALJ did not wholly reject the [third party] observations; but" the ALJ did properly "recognize the limited significance of such testimony." Arnold, 473 F.3d at 821–22. In addressing the opinions of the plaintiff's son, which the ALJ noted consisted of "a third party function report on behalf of his mother dated November 8, 2019 and a seizure questionnaire dated June 4, 2020," the ALJ provided the following:

> Although the undersigned has considered the firsthand observations by the claimant's son about activities or avoidance of activities, the undersigned does not find this opinion persuasive. First, Mr. Pribnow is not an acceptable medical source. Second, the undersigned does not accept Mr. Pribnow's reports of the claimant's symptoms, as these are subjective to the claimant. The undersigned has fully considered Mr. Pribnow's observations regarding the claimant's activities/avoidance of activities and changes in the

57

claimant's behavior and routine as he was in a position to make the observations. However, the undersigned finds that the objective medical evidence is more informative about the claimant's limitations and work capacity.

Dkt. No. 10-1 at 31 (citing Exs. 5E, 9E, Dkt. No. 10-1 at 226–38, 258–61). In considering the "several letters written by family members, friends, and some unidentified individuals regarding" the plaintiff's impairments and symptoms, the ALJ concluded that the letters were not persuasive:

> None of these individuals are acceptable medical sources; the undersigned does not accept their reports of the claimant's symptoms, as these are subjective to the claimant; and the undersigned finds that the objective medical evidence is more informative about the claimant's limitations and work capacity.

Dkt. No. 10-1 at 31 (citing Ex. 12E, Dkt. No. 10-1 at 286–92). The ALJ did not err in her consideration of the opinions of third-party non-medical sources.

## IV. Conclusion

The court **ORDERS** that the final administrative decision of the Commissioner of Social Security, denying the plaintiff's application for disability benefits, is **AFFIRMED**.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 24th day of April, 2023.

BY THE COURT:

**HON. PAMELA PEPPER**
**Chief United States District Judge**

58